## MUNROE v. TOUSEY. (No. 1.)

*(Supreme Court, General Term, First Department. January 13, 1891.)*

1. NOM DE PLUME—RIGHTS OF PUBLISHER—INJUNCTION.
   A publisher who selects a *nom de plume*, and procures an author to write under it, acquires a property therein which will be protected by injunction against a third party publishing fiction under the same pseudonym.

2. SAME—WHAT CONSTITUTES INFRINGEMENT.
   The rights of a publisher in the *nom de plume* "Old Sleuth," are infringed by publications under the pseudonym "Sleuth," or "Young Sleuth," or others in which the name "Sleuth" conspicuously figures.

3. SAME—LACHES.
   In such case, laches cannot be imputed to the plaintiff in the assertion of his rights, unless he knew of the infringement and acquiesced in it; and even then the plaintiff will not be estopped to assert his rights, unless it appears that the defendant was thereby induced to make outlays and expenditures in continuing such publications.

Appeal from special term, New York county.

Action by George Munroe against Frank Tousey, to restrain the defendant from using the *nom de plume* "Sleuth" in the publication of certain works of fiction. There was a judgment for plaintiff, and defendant appeals.

Argued before BRADY and DANIELS, JJ.

*William H. Townley*, for appellant. *Roger Foster*, for respondent.

BRADY, J. The plaintiff objects to the defendant's use of the word "Sleuth" in connection with the publication of certain works of fiction, claiming that it was, and has been since 1872, his property, and was employed by him in connection with his publication of numerous works of fiction, and most profitably. The defendant, while impliedly admitting by his acts that ownership, challenges the plaintiff's title. He assumes that, by the proofs, it is established that a writer of fiction named Halsey owned the pseudonym "Old Sleuth," and from that erroneous view of the effect of them builds up theories that cannot be sustained. The proofs show that the *nom de plume* mentioned was selected by the plaintiff, under which Halsey should write for him, and he created it for that purpose, and whatever limited interest Halsey had sprung from his use of the name under these circumstances. His em-

ployment began, certainly, when he wrote under the pseudonym of "Tony Pastor," in 1873, and continued down to the present time, some of his stories having been republished in the "Fireside Companion," "Old Sleuth Library," and "Seaside Library" serials, owned and issued by the plaintiff. The defendant's counsel, *arguendo*, says the plaintiff failing to prove the agreement did not put Halsey upon the stand as a witness to remove any doubt on that subject, and he invokes the omission as prejudicial to the plaintiff's case. The fallacy of this, aside from the error in asserting that there was no proof of ownership, is apparent when the fact is arrayed that it was the plaintiff, and not Halsey, who created the *nom de plume*, and who required Halsey to use it in preparing the works of fiction which the plaintiff meant to employ in his business. And, again, if Halsey could prove his ownership of the pseudonym, why did not the defendant call him to disprove the plaintiff's alleged title? It is true that, in an action brought by him against a person other than the plaintiff, Halsey succeeded in preventing the use of the name, but the judgment rendered in that action was in no respect *res adjudicata* of the plaintiff's claim. Aside from that the author, Halsey, had a distinct interest in preventing another from using a name under which he was writing, and establishing a reputation which would be recognized, although the plaintiff herein in fact owned it. His agreement to produce the fictions for the plaintiff involved and necessitated the use of it, and it was to him, therefore, a valuable right which no one else possessed, for aught that appears on the record. However this may be, the plaintiff's ownership of it was not successfully combated, and when the defendant's use of it was complained of he at once promised the plaintiff to desist, and did so for a time at least. The case seems to present a familiar phase of piracy, in the pursuit of gain,—a willingness to appropriate what has been made valuable by the forethought of another, and enjoy thus all the benefit that might be derived from his shrewdness, ingenuity, or capacity. The fact that Halsey, assuming it to have been so proved, wrote stories under the name mentioned for others than the plaintiff does not in any way affect the issue, even if the plaintiff consented to it or did not object. He did object, and does, to the defendant's use of the pseudonym, and asserts his ownership. The defendant, therefore, has no standing upon the proposition that the evidence does not show the plaintiff's ownership of the *nom de plume* in question. The learned justice in the court below so found, and the review of this conclusion furnishes no ground for disturbing it. This result applies to all the publications mentioned in the findings, inasmuch as the word "Sleuth" has been employed in all, although in some more conspicuously than others. It matters not whether the *sobriquet* be "Old Sleuth" or "Young Sleuth;" the designation adopted by the plaintiff of the word "Sleuth" made it his property, and it was improperly used by the defendant, therefore.

The defendant can gain nothing from the supposed laches of the plaintiff in asserting his rights. It appears that, in 1883, the plaintiff was informed that the defendant had ceased to imitate his titles, and that shortly after that time his establishment was destroyed by fire, an event soon after followed by the defendant's insolvency. The plaintiff was not bound to be constantly on the *qui vive*, searching after the defendant's illegal acts. The doctrine of laches would not apply, unless the plaintiff knew of the infringement and acquiesced in it, (*Sawyer* v. *Kellogg*, 9 Fed. Rep. 601, 602;) and there is no proof of these elements in the record. The defendant was not induced in any way by the plaintiff to make any expenditures, or to continue the publications which he made. At least he was only passive, and failed to object to the defendant's doing what he did. *Rubber Co.* v. *Rothery*, 107 N. Y. 310, 315, 316, 14 N. E. Rep. 269. Where the statute of limitations has not run, and there is no estoppel or acquiescence, a court of equity will not deny relief on the ground of laches. *Platt* v. *Platt*, 58 N. Y. 646.

The defendant made an assignment on the 14th March, 1885, and it is claimed that since then he has had no interest in the business; but it appears that he was employed to superintend it, and did so, receiving a salary of $5,000 for his services. It is claimed also, in furtherance of this proposition, that his assignee, Stillman R. Walker, had the legal title to the property since the time of his assignment, including the *nom de plume* and titles that have been used, but it appears that the publications complained of were embraced in his assignment, and that the business has been continued under the defendant's supervision, he determining what publications should be made. The profits were devoted to the payment of his compensation, and to the diminution of his indebtedness, and thus he received all the benefit of their use, either directly or indirectly. He enabled the assignee to employ the objectionable publications by assigning them, and, as it appears, for his own advantage. He must take the consequences. He is the chief wrong-doer. Besides, it has been held that, in torts of misfeasance like the violation of a trade-mark, agents and servants are personally liable to the injured party. *Estes* v. *Worthington*, 30 Fed. Rep. 465; see *Phelps* v. *Wait*, 30 N. Y. 78. Here the defendant, as agent, was subordinated, as such, by his own act of assignment. No reason appears for interfering with the judgment, and it should be affirmed with costs.